**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERCA,<br><br>v.<br><br>GARRETT MULDOR,<br><br>*Defendant.* | CRIMINAL ACTION<br>NO. 26-190 |

**Pappert, J.** **November 16, 2026**

**MEMORANDUM**

Philadelphia police officers Abdel Kanan and Leo Breslin were on routine patrol in their marked car when they saw Garrett Muldor standing on a street corner. Upon seeing the police, Muldor put his cellphone to his ear and began walking up the street. Deeming that behavior suspicious, the officers followed Muldor and pulled up slightly behind him. Officer Breslin got out of the car and approached Muldor from behind. A struggle between the two ensued, and Officer Kanan, who came to his partner's aid, recovered a gun from Muldor's waistband.

Muldor was indicted on one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the gun, along with marijuana recovered from his jacket and a swab of his DNA. The Court held a hearing at which Officers Kanan and Breslin testified and the parties presented various exhibits, including Kanan's body worn camera video of the stop and the moments leading up to it. The Court grants Muldor's motion because the officers lacked reasonable suspicion that he possessed a weapon.

I

On March 27, 2026, Officers Kanan and Breslin were patrolling the 5100 Darrah Street area of Philadelphia's 15th Police District. (Hr'g Tr. 13:24–14:11.) Officer Kanan has been a police officer for ten and a half years and assigned to the 15th District for the last three. (*Id.* at 6:2–12.) He has made hundreds of gun arrests, with fifteen to twenty near the area of 5100 Darrah Street. (*Id.* at 9:25–10:6.) Officer Breslin has been a Philadelphia police officer for almost six years, assigned to the 15th District for the last four. (*Id.* at 119:12–23.) He has responded to roughly eighty gun arrests in the vicinity of 5100 Darrah Street. (*Id.* at 121:16–24.)

Both officers are members of "Five Squad," a special assignment with a focus on "proactive policing" and getting "guns and drugs off the street." (*Id.* at 17:1–6; 123:14–124:1.) The area of 5100 Darrah Street is located in PSA-1 of the 15th District and is designated as a "pinpoint grid," meaning it's a high crime area. (*Id.* at 7:1–8:14.) The officers have responded to many shootings and robberies in the area and made many arrests there. (*Id.* at 8:7–9.)

At the time of the incident, Officers Kanan and Breslin had been partners for about two years. (*Id.* at 14:8–16.) Officer Kanan was driving the police car and Officer Breslin was in the passenger seat. (*Id.* at 14:17–19.) Just before 6:00 p.m., they were heading southbound on Frankford Avenue when Kanan turned left onto Pratt Street. When they were about halfway down the block, and about 200 feet away, they noticed a male, later identified as Muldor, standing alone at the corner of Pratt and Darrah. (*Id.* at 18:7–19:7; Hr'g Ex. D18.) Muldor was wearing a black jacket over a black sweatshirt. (Hr'g Tr. 182:10–11.) Muldor looked in their direction, turned around, put

a cellphone to his ear, and started to walk away, (*Id.* at 19:18–21), behavior the police thought to be a "little suspicious" and "unusual." (*Id.* at 20:21–21:14; 127:7–11.)

The officers then quickly drove up Pratt Street, through a stop sign, and turned right on Darrah to follow Muldor. (Hr'g Ex. G1 at 00:30.) Officer Kanan testified they planned to "talk to him, ask him if he had a gun." (Hr'g Tr. at 22:10–12.) Officer Kanan's body worn camera video showed the officers pull up behind Muldor as he continued walking away. (Hr'g Ex. G1 at 00:27–00:37.)

At 5:57:02 p.m., Breslin got out of the car and began to approach Muldor from behind. (*Id.* at 00:40.) By 5:57:15 p.m., the time Breslin's body worn camera comes on, he and Muldor are already fighting.[1] (Hr'g Ex. G2 at 00:00.) In the roughly ten seconds between when Breslin got out of the car and frisked Muldor, Breslin testified that Muldor "bladed his body away" and "appeared nervous." (Hr'g Tr. 127:25–128:10; 130:4–9.) When Kanan got out of the car, Muldor was already on top of Breslin. (*Id.* at 30:3–10.) After handcuffing Muldor, Kanan recovered a black Taurus G3 9mm handgun from his front waistband area. (*Id.* at 30:22–32:18; Hr'g Ex. G5.) Officers later recovered marijuana from Muldor's pocket and took a DNA swab from Muldor to compare to the gun. (Hr'g Tr. at 34:3–10.)

## II

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures," including unreasonable investigatory stops of

---

[1] Officer Breslin did not activate his body worn camera until he picked it up off the ground after frisking Muldor. (Hr'g Ex. G2 at 1:00.) There is a sixty second buffer period whenever body worn cameras are activated, meaning "the BWC will record sixty (60) seconds of image immediately preceding the activation." (Hr'g Ex. D7 at 3.) With the buffer period, the body worn camera footage begins sixty seconds before Breslin turned the camera on, but it did not go back far enough to record any of the events leading up to the frisk.

persons. U.S. Const. amend. IV; *United States v. Cortez*, 449 U.S. 411, 417 (1981). Brief investigatory stops are permissible if supported by "reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch'" as the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 27 (1968). If the officer has reasonable suspicion that a suspect is armed and dangerous, he may also conduct a protective frisk of the suspect's outer clothing for weapons. *Id.* at 27.

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir.1992)). However, once the defendant has established a basis for his motion, the burden shifts to the government to prove, by a preponderance of the evidence, that the search or seizure was reasonable. *Id.*; *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). If the court finds a stop or search was unreasonable, all evidence obtained therefrom must be suppressed. *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

III

The initial step of a Fourth Amendment suppression analysis is to determine the moment of the seizure. *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008). A seizure occurs when there is "either (a) 'a laying on of hands or application of physical

force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *Brown*, 448 F.3d at 245 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Police officers may approach individuals without reasonable suspicion or probable cause and may question such individuals without implicating the Fourth Amendment. *Florida v. Royer,* 460 U.S. 491, 497 (1983). An individual approached in this manner "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Id.* at 498 (citing *Terry*, 392 U.S.at 32–33 (Harlan, J. concurring)).

The seizure here occurred when Officer Breslin first placed his hands on Muldor. When Breslin got out of the police car, he asked Muldor if he had a gun and Muldor responded no. (Hr'g Tr. 132:18–19.) That exchange constituted only an encounter between the two. Muldor then continued walking away, at which point Breslin "[g]rabb[ed] him to stop him." (Hr'g Tr. 171:8.) Breslin seized Muldor with a "laying on of hands," contemporaneous with the frisk. *Brown*, 448 F.3d at 245 (quoting *Hodari D.*, 449 U.S. at 626).

IV

Reasonable suspicion is determined by "the facts available to the officer at the moment of the seizure," *Brown*, 448 F.3d at 245 (quoting *Terry*, 392 U.S. at 21–22), and "unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* at 246 (quoting *Cortez*, 449 U.S. at 417–18). Courts are to "give considerable deference to the police officers' determinations of reasonable suspicion." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).

In evaluating reasonable suspicion, courts consider "the totality of the circumstances—the whole picture." *Cortez*, 449 U.S. at 417. "Factors that support reasonable suspicion include the presence of a suspect in a high crime area, behavior that is nervous or evasive, and 'behavior that conforms to police officers' specialized knowledge of criminal activity.'" *Spears v. Leporace*, 449 F. App'x 187, 189 (3d Cir. 2011) (quoting *Torres*, 534 F.3d at 211). An officer can act reasonably in stopping a man whose acts, when viewed in isolation, were entirely legal, as long as the totality of the circumstances gives rise to a reasonable suspicion of criminal activity. *Id.* "The ultimate question is whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the defendant's] detention." *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003).

A police officer may conduct a protective frisk for weapons "where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry,* 392 U.S. at 27. The "issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger" but there is no requirement that the officer "be absolutely certain that the individual is armed." *Id.* (citations omitted).

A

The Government argues that the officers had "reasonable, articulable suspicion" to stop and frisk Muldor because of his presence in a high crime area, nervous behavior, a visible "bulge" in his waistband, and the blading of his body away from officers. (Gov't Resp. in Opp. at 10–12.)

1

This entire incident took place in a high crime area. The officers were patrolling a "pinpoint grid" of the 15th District, where the officers described responding to numerous shootings and robberies, with Breslin stating the area was a block away from "either the worst or second-worst corner in the district" and that "[n]arcotics sales, shootings, robberies, [and] homicides" all take place there. (Hr'g Tr. 7:24–8:9; 124:5–16.) Someone's mere presence in a high crime area is not, however, "enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Officers may also consider the defendant's demeanor during the stop. *Id.* ("[N]ervous, evasive behavior is a pertinent factor."). Kanan testified that when he first saw Muldor, from about 200 feet away, Muldor "looked in our direction, then quickly turned around, put a cellphone to his ear, and started to walk away." (Hr'g Tr. 19:18–21.) Kanan thought that behavior "was a little suspicious." (*Id.* at 19:22–24.) Breslin similarly testified that when he first saw Muldor, standing alone, Muldor took out his phone and began "walking away." (*Id.* at 160:17–161:1.) Kanan's body worn camera footage shows Muldor walking down the street, with his cellphone to his ear. (Ex. G1 at 00:37–00:39.) But walking away from the police, even in a high crime area, does not in and of itself give rise to reasonable suspicion that criminal activity is afoot. *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000).

2

Officers Kanan and Breslin also both testified they saw a bulge in the front-right side of Muldor's waistband, a crucial factor in the totality of the circumstances analysis.

The officers' testimony on this point, however, was not credible, largely because it is inconsistent with Kanan's body worn camera footage.

On direct examination, Officer Kanan testified that "as we got next to [Muldor], I could see a bulge in his waistband, like pants area. I couldn't tell what it was. My partner exits the vehicle at that point." (Hr'g Tr. 23:16–18.) But his body worn camera video shows the police car was behind Muldor when Breslin got out to confront him, with Muldor continuing to walk away, (Ex. G1 at 00:36–00:40), something Kanan conceded when cross-examined. (Hr'g Tr. 73:22–74:5.) Kanan "purpose[fully]" never pulled the car ahead of Muldor and therefore all observations were from behind Muldor. (*Id.* at 76:16–24.) When further questioned on when exactly he saw the "bulge," Kanan said that he told Breslin he saw the bulge before Breslin got out of the car. (*Id.* at 76:25–77:4.) The bulge was in the front-right of Muldor's pants, which means Kanan would not have seen it from behind and to the left of Muldor. (*Id.* at 77:5–14.)

On redirect examination, Kanan went back to claiming he pulled up next to Muldor rather than staying behind him. But his own body worn camera footage shows the police car pull up behind Muldor, who continues to walk away. (Ex. G1 at 00:36–00:40.)

Officer Breslin's testimony was similarly incredible. He said on direct examination that, while in the car, he saw a bulge in the front of Muldor's waistband. (Hr'g Tr. 127:25–128:17.) He conceded on cross-examination, however, that when they pulled up Muldor "was still ahead of our car." (*Id.* at 161:11–20; 163:1–3.) Breslin also testified that Kanan said he saw the bulge before Breslin got out of the car. (*Id.* at 169:11–18.) Breslin too shifted gears on redirect examination, saying that Muldor was

parallel with him when he got out of the car, but Kanan's body worn camera video foils that version too. (*Id.* at 172:7–15.) Again, the video shows Muldor walking away from the officers as they pull up and Breslin gets out of the car, and neither officer said Muldor ever turned to face them. (Ex. G1 at 00:36–00:40.) Like Kanan, Breslin could not have seen a bulge in the front-right side of Muldor's waistband, under a sweatshirt and jacket, from that angle.

3

The officers also testified that once Breslin got out of the car, Muldor "bladed his body away," something Breslin described as "turning his front away from, like, my partner, the car, and then me." (Hr'g Tr. 128:6–10; 131:10–14.) But the Court cannot credit this, given the inaccuracies in their testimony about when they saw the bulge in the waistband. And there is nothing to corroborate this account because Kanan's body worn camera did not capture it and Breslin had not activated his own body worn camera. Philadelphia Police Department Directive 4.21 requires officers to activate their body worn cameras "during all law enforcement related encounters," including whenever conducting a "pedestrian investigation." (Hr'g Ex. D7 at 2.) The Directive has various purposes, including to enhance officer safety and the public trust, as well as to "document statements and events during the course of an incident." (*Id.* at 1.) It takes only a "double-click" on the center of the camera to activate it. (Hr'g Tr. 77:24–78:4.) Breslin claimed he did not turn his on before confronting Muldor because the situation was "fast paced." (*Id.* at 138:25–139:10.) But he had plenty of time to click the button before things got out of hand. Both officers testified they intended all along to stop Muldor and "talk to him." (*Id.* at 22:10–12; 173:8–11.) Breslin had at least

fifteen seconds, between when he first saw Muldor (who he suspected was armed) and got out of the car to confront him, to turn the camera on. (Ex. G1 00:22–00:40.) His stated reason for not doing so was not credible.

And, again, Muldor was free to walk away. *Johnson v. Campell*, 332 F.3d at 208 ("[A]n individual 'has a right to ignore the police and go about his business' without that activity being deemed inherently suspicious." (quoting *Wardlow*, 528 U.S. at 125)). While "unprovoked flight upon noticing the police," along with other indicia of wrongdoing, can constitute reasonable suspicion, a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Wardlow*, 528 U.S at 125 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). Neither officer claimed Muldor at any point attempted to flee.

B

Under the totality of the circumstances, the police did not have reasonable suspicion that Muldor was engaged in criminal activity and armed. *United States v. Graves*, 877 F.3d 494, 498 (3d Cir. 2017) (requiring courts to "review the totality of the circumstances leading up to the moment of the defendant's seizure"). "Though the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they must serve to eliminate a substantial portion of innocent travelers." *United States v. Mathurin*, 561 F.3d 170, 174 (3d Cir. 2009) (quotation omitted). When Officer Breslin stopped and frisked Muldor, he knew little more than that Muldor was walking away from the police with a phone to his ear in a high crime area. *See United States v. Sears*, 835 F. App'x 671, 674 (3d Cir. 2020) (holding that when seized, officers had only observed "Sears walking away from them in a high-crime area at night, which

does not rise to the level of reasonable suspicion"); *United States v. Springs*, No. 25-310, 2026 WL 295742, at *9 (E.D. Pa. Feb. 4, 2026) (holding no reasonable suspicion where "Defendant nervously walked away" in a high crime area).

"[A] suspicious look and a gut feeling, without more, do not provide reasonable suspicion that a person may be armed." *United States v. Hall*, 193 F. App'x 125, 130 (3d Cir. 2006). Officers Kanan and Breslin may have had a "hunch" that Muldor was armed, but an officer "must be able to point to specific and articulable facts," *Terry*, 392 U.S. at 21, 27, and the officers' testimony on the moments leading up to the seizure was not credible for the reasons explained. As a result, the Government has not shown by a preponderance of the evidence that the search and seizure was reasonable.

C

Because the officers did not have reasonable suspicion to stop and frisk Muldor, all evidence recovered as a result of the search is the "fruit of the poisonous tree" and must be suppressed. *Brown*, 448 F.3d at 244 (citing *Wong Sun*, 371 U.S. at 487–88). The Government does not contend that the marijuana or DNA swab should not be considered the fruit of Muldor's unlawful seizure. *See Mosley*, 454 F.3d at 269 ("To overcome [the defendant's] suppression motion, therefore, the government would have had to establish one of the traditional exceptions to the *Wong Sun* rule: attenuation, inevitable discovery, independent source, or some intervening act or event sufficient to purge the taint of the illegal stop."); *United States v. Parker*, 240 F. Supp. 3d 318, 326 (M.D. Pa. 2017) (granting motion to suppress after finding the stop was not based on reasonable suspicion and the government had not "raised any basis for the fruit of the poisonous tree doctrine not to apply").

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***

Gerald J. Pappert, J.